OPINION OF THE COURT
Gabrielli, J.
 In this case, we are asked to consider whether the terms of an indemnity agreement preclude the indemnitor from maintaining a third-party action in negligence against the indemnitee. Also presented for our consideration is the question whether an indemnitor is obligated to reimburse an indemnitee for losses occasioned by the indemnitee’s own failure to act within a reasonable time in order to mitigate damages. We conclude that both questions should be answered in the negative.
In 1970, Ms. Helen Walker acquired 1,140 shares in Union Camp Corporation. Although she transferred the certificates representing these shares approximately one month after she acquired them, the transfer, for some reason, was never recorded by the corporation or its transfer agent, Morgan Guaranty Trust Company (Morgan). As a consequence, Ms. Walker continued to receive dividends from Union Camp. Her son, Alexander Walker, Jr., who knew she was receiving these dividends but was apparently unaware of the transfer, attempted to locate the corresponding stock certificates among his mother’s personal effects. When he was unable to do so, he suggested to his mother that she ask the corporation to issue duplicate certificates evidencing her ownership of the shares. The record does not make clear whether Ms. Walker remembered at this point that she had earlier transferred the shares, but, in any event, she acquiesced in her son’s suggestion.
*30 The corporation’s transfer agent agreed to the issuance of duplicate stock certificates, but insisted that Ms. Walker execute an instrument attesting to the fact that she had not sold or transferred the original certificates and, further, that she had conducted a diligent search for the originals before applying for duplicates. The instrument also provided that Ms. Walker would indemnify Union Camp Corporation and Morgan against “any and all liabilities, loss, damage or expense in connection with, or arising out of their compliance with [her request for duplicate certificates]”. Finally, the instrument stated that Ms. Walker’s obligation to indemnify Union Camp and Morgan would be secured by a “blanket bond” issued by Federal Insurance Company (Federal), under which Federal was to “defend, indemnify and save harmless Assured [Morgan Guaranty and Union Camp] from and against any and all * * * liabilities, damages, costs * * * and other expenses of every nature * * * by reason of the Original Instrument and/or the issuance of * * * duplicates * * * whether or not caused by, based upon, or arising out of inadvertence, accident, oversight or neglect on the part of Assured”. In exchange for its agreement to assume this obligation, Federal demanded that both Ms. Walker and her son execute another agreement indemnifying it “against any and all loss, damage [and] expense * * * which it shall at any time incur by reason of its [undertaking] ”. The net result of these interlocking indemnity agreements was that Union Camp and Morgan were indemnified against loss by Federal and Ms. Walker, and Federal, in turn, was indemnified against loss by Ms. Walker and her son.
Following the execution of the various indemnity agreements, Morgan issued duplicate stock certificates to Ms. Walker. Shortly thereafter, she sold the shares represented by the duplicate certificates for the sum of $52,800. Approximately two years later, in September of 1975, an audit was conducted and it was discovered that Ms. Walker’s original stock certificates had been transferred by her in 1970. This revelation led Union Camp and Morgan to become concerned about an “overissuance” of Union Camp stock resulting from the issuance of the duplicate certifi *31 cates. Morgan promptly notified Federal of the problem, and Federal then made a demand upon its indemnitors, the Walkers, to replace the overissued shares.
Ms. Walker’s son, who was at this point administering his deceased mother’s estate, asked Federal to refrain from taking any action while his attorney evaluated the situation. Settlement negotiations ensued, but by February of 1976 it became apparent that Walker was not prepared to make an offer that would be acceptable to the other parties. It was not until August of 1976, however, that Union Camp and Morgan moved to remedy the “overissuance” problem by purchasing replacement shares on the open market. By this time, the common stock of Union Camp had “split” three for two, and, as a consequence, the cost of replacement had risen to $108,515.25.
Pursuant to its blanket indemnity bond, Federal paid Union Camp’s and Morgan’s claim for the cost of replacement.[1] It then commenced an action against Alexander Walker, Jr., and Ms. Walker’s estate for reimbursement. Walker, acting on his own behalf and on behalf of the estate, impleaded Union Camp and Morgan on the theory that their negligence in failing to record the original 1970 transfer was, at least in part, the proximate cause of the loss.
Prior to trial, Federal moved for summary judgment against Walker and the estate. Third-party defendants Union Camp and Morgan then moved for summary judgment dismissing the third-party negligence complaint on the ground that the various indemnity agreements insulated them from liability to the Walkers. Special Term agreed with the contentions of the third-party defendants and dismissed the third-party complaint as requested. The court, however, declined to grant summary judgment to plaintiff Federal for the full amount demanded in its complaint. Instead, the court awarded Federal $52,800, the amount realized by Ms. Walker when she sold the duplicate shares in 1973, and held that the remainder of Federal’s claim should be resolved in a plenary trial. The Appellate Division, however, modified the order of Special Term. The *32 Appellate Division first concluded that the indemnity agreements did not present a bar to a third-party negligence action against Union Camp and Morgan. Additionally, the court held that Federal was entitled to summary judgment in the full amount demanded in its complaint. Following the entry of the order by the Appellate Division, defendant Walker appealed as of right from the modification by which he and the estate of his deceased mother were aggrieved (CPLR 5601, subd [a], par [iii]). Third-party defendant Union Camp and Morgan also appealed pursuant to leave granted by the Appellate Division, and that court also certified the following question of law: “Was the order of this Court, insofar as it denied the third-party defendants-respondents’ motion for summary judgment dismissing the third-party complaint, properly made?”
Turning first to the contentions of the third-party defendants, we conclude that there was no error in the Appellate Division’s decision to reinstate the third-party negligence complaint. The third-party defendants’ motion to dismiss this complaint was based upon the existence of the interlocking indemnity agreements, which, it was claimed, rendered the third-party defendants immune from liability in negligence to Walker and the decedent whose estate Walker represents. A careful analysis of the relationships created by the various indemnity agreements, however, belies this contention.
The decedent, Ms. Walker, agreed “to indemnify and protect [the third-party defendants] from any and all liabilities, loss, damage or expense in connection with, or arising out of [their issuance of duplicate stock certificates] ”. These words of indemnification merely established the decedent’s obligation to hold harmless the third-party defendants in the event that they were held liable to some stranger to the transaction as a result of their decision to issue duplicate stock certificates. As such, the agreement simply represented an allocation of the risk of liability among the several contracting parties (see Hogeland v Sibley, Lindsay & Curr Co., 42 NY2d 153,158). Nothing in the language of the agreement, however, indicates an intention on the part of the decedent to waive her own rights against *33 the third-party defendants or to exonerate them from direct liability to her for pecuniary injuries resulting from their negligence (compare Gross v Sweet, 49 NY2d 102, with Hogeland v Sibley, Lindsay & Curr Co., supra, and Levine v Shell Oil Co., 28 NY2d 205). Thus, the indemnity agreement executed by Ms. Walker cannot legitimately be invoked by the third-party defendants as a defense to the negligence claim brought on behalf of her estate.
Similarly, the third-party defendants cannot rely upon any of the various indemnity agreements as a defense to the negligence claim asserted by defendant Alexander Walker, Jr., in his individual capacity. Walker was not a party to the indemnity agreement between the decedent and the third-party defendants. Instead, he agreed only to indemnify plaintiff Federal, the surety, from loss in the event that Federal was obliged to reimburse the third-party defendants for claims made against them. Inasmuch as Walker’s obligations under the lone indemnity agreement he signed ran solely to Federal, the agreement cannot be used by the third-party defendants to defeat Walker’s individual claim against them. Thus, the Appellate Division acted correctly in refusing to dismiss the third-party complaint.[2]
We cannot approve, however, that portion of the Appellate Division decision which granted summary judgment to plaintiff surety, Federal, in the full amount *34 demanded in its complaint ($114,842.25). The parties discovered in September of 1975 that the original stock certificates, which were previously thought to have been lost, had actually been transferred in 1970 by the decedent. Yet, no efforts were made to correct the apparent over-issuance of shares until August of 1976, when Union Camp and Morgan purchased an equivalent number of shares on the open market and then obtained reimbursement from the surety. By that time, the price of the shares had risen dramatically above the price that the corporation would have had to pay had it entered the market promptly in September of 1975.
Defendant Walker does not dispute that both he and the decedent’s estate are obligated to reimburse Federal by virtue of the separate indemnity agreements that were executed in the surety’s favor. He does, however, contend that he should not be held liable for the entire amount which was ultimately paid for the shares ($108,515.25), since the third-party defendants waited nearly a year after the over-issuance was discovered before entering the market in an effort to “cover”. Asserting that this delay was unreasonable under the circumstances, defendant Walker argues that the increase in price which was attributable to the delay should be absorbed either by the third-party defendants or by the surety, which failed to challenge the amount of reimbursement demanded by Union Camp and Morgan.
We agree with defendant Walker’s contention that, under the circumstances of this case, neither he nor the decedent’s estate should be required to reimburse Federal for those expenses that are attributable to any “unreasonable” delay by the parties in correcting the overissuance problem. The surety agreed to reimburse the third-party defendants for any loss they might reasonably sustain by virtue of the issuance of the duplicate stock certificates. The surety was not, however, obliged to remunerate the third-party defendants for losses occasioned strictly by their own failure to take remedial measures within a reasonable period of time.[3] Similarly, although defendant Walker and decedent had *35 agreed to indemnify Federal in the event it was obliged to pay the third-party defendants, neither Walker nor the decedent’s estate should be required to reimburse the surety for any portion of its payment which represented the loss arising from the third-party defendants’ lack of diligence. Indeed, a contrary result would be particularly inequitable in this case, since Federal was fully aware of and, in fact, acquiesced in the third-party defendants’ decision to postpone corrective action. Under such circumstances, Federal should not be permitted to pass on any unnecessary loss resulting from delay to defendant Walker.
Whether any portion of the third-party defendants’ 11-month delay in “covering” was unreasonable, however, remains an open question. As the Appellate Division noted, the third-party defendants’ failure to act promptly may have been attributable, at least in part, to the settlement negotiations which had been initiated by defendant Walker. On the other hand, there may be some question as to whether it was reasonable for the third-party defendants to postpone the purchase of substitute shares on the strength of these negotiations. Moreover, the third-party defendants have not offered any explanation as to why they failed to act between February of 1976, when the settlement negotiations apparently broke down, and August of that year, when they finally entered the market to purchase substitute shares. Under these circumstances, the question of the “reasonableness” of the delay is one that can only be resolved by the trier of fact after a plenary trial on the issue. Inasmuch as defendant Walker does not dispute that he is liable to plaintiff surety for at least $52,800, the amount for which the duplicate certificates were sold in 1973, the case should be remitted for a trial on the question of the remaining dam *36 ages, if any, due to Federal on its first and second causes of action as well as on the question of the third-party defendants’ liability to Walker on the negligence causes of action asserted in the third-party complaint.
Accordingly, on the appeal by the third-party defendants, the order of the Appellate Division, insofar as appealed from, should be affirmed, with costs, and the question certified answered in the affirmative. On the appeal by defendant third-party plaintiff Walker, the oder of the Appellate Division, insofar as appealed from, should be modified, with costs, and the case remitted for further proceedings in accordance with the opinion herein and, as modified, affirmed.

. Federal also paid $6,327 to Morgan as reimbursement for overpaid dividends resulting from the issuance of the duplicate stock certificates.

. We recognize that our decision permitting the third-party complaint to stand will create a theoretical “daisy chain” of sorts, since if defendant Walker is permitted to recover in negligence from the third-party defendants, the latter would presumably have a second claim for indemnification against plaintiff surety, Federal. And, if such a claim were asserted, Federal, in turn, could theoretically assert a claim for indemnification against defendant Walker on the basis of his agreement to hold it harmless against loss. That the potential for this type of circular litigation exists, however, does not provide a basis for dismissing the third-party complaint.
The only issue before this court on the third-party defendants’ appeal is whether any of the various indemnity agreements signed by the parties constitute a complete defense to the third-party negligence claim. Thus, the possibility that the parties may assert rights in the future which would have the effect of depriving defendant Walker of the fruits of his victory (assuming he is ultimately successful) need not concern us. While the parties may find some unwanted irony in their present situation, it must be recognized that it was they and not the courts who created the danger of “round-robin” recoveries through their interlocking indemnity agreements.

. The dissenter’s suggestion to the contrary would lead to an implausible *35 and unacceptable result. Under the dissenter’s view, the indemnitee would be in a position to unilaterally increase the indemnitor’s liability by simply sitting back and refusing to take reasonable steps to cover its loss. As time passed, the cost of “covering” could escalate and, as a consequence, the indemnitor’s obligation would spiral. Indeed, unless some durational limit is placed upon the indemnitee’s freedom to act, there is nothing to prevent the indemnitee from willfully multiplying the indemnitor’s loss, since there would be no incentive for the indemnitee to act in an economically reasonable manner. The economic waste which would result in situations such as this is alone sufficient reason to reject the approach urged by the dissent.